# Exhibit G

1 of 1 DOCUMENT

Copyright 2006 The New York Times Company
The New York Times

January 8, 2006 Sunday
Late Edition - Final

**SECTION:** Section 6; Column 1; Magazine; Pg. 44

**LENGTH:** 8136 words

**HEADLINE:** The Bush Administration vs. Salim Hamdan

**BYLINE:** By Jonathan Mahler.

Jonathan Mahler, a contributing writer for the magazine, is working on a book about the Hamdan case, to be published by Farrar, Straus & Giroux.

**BODY:**

In 1996, Salim Hamdan, a 26-year-old Yemeni with a thick mustache and kinky black hair, was working part time as a taxi driver, dividing his modest income between the mattress he rented in a crowded boardinghouse in the dirty, bustling city of Sana and his daily supply of khat leaves, the stimulant that most Yemeni men chew by the fistful. Then one day the low-hanging horizon of his life lifted: he was recruited for jihad. He joined about 35 other Muslims, mostly Yemenis, who were preparing to leave for Tajikistan to fight alongside that country's small Islamic insurgency against its Russian-backed government.

One of the group's leaders was a self-assured young man named Nasser al-Bahri. Hamdan, an orphaned only child from a rural tribal village in southern Yemen, was naturally drawn to strong personalities. Although two years his junior, al-Bahri, who grew up in an upper-middle-class family in Jidda, Saudi Arabia, was far more worldly and sophisticated than Hamdan and was without question the most educated person he had ever met. Al-Bahri had studied business in college, but he was also deeply steeped in the Koran, having become a devout Muslim as a teenager in rebellion against his bourgeois upbringing. He spoke comfortably and forcefully about the plight of Muslims all over the world, and he had traveled extensively, to places as far as Bosnia and Somalia, to defend his oppressed Islamic brethren.

Hamdan, who had the rough equivalent of a fourth-grade education, wasn't especially religious and had no grand plans for his life other than the hope that he might someday be married, but he nevertheless embraced the idea of becoming a holy warrior. It didn't hurt that the trip was to be paid for -- al-Bahri told him that the group had raised money from a handful of Saudi-based Muslim charities -- and that Hamdan would also receive a salary.

The jihadis convened in Jalalabad, Afghanistan, and started working their way north toward Tajikistan, first by jeep and then, when the roads were impassable, on foot. After six months traversing Afghanistan's mountainous, often snow-covered terrain, they were turned back at the Tajik border.

At loose ends, one of the jihadis suggested that they go see a man named Osama bin Laden, a well-known sheik among radical Islamists who led a militant group of itinerant Muslim holy warriors called Al Qaeda. Having only recently been expelled from Sudan, bin Laden had relocated to Afghanistan, where he planned to rebuild Al Qaeda with the help of his new hosts, the Taliban. Bin Laden earned his reputation during the anti-Soviet campaign in Afghanistan in the 1980's, but he was now enlisting soldiers for his new crusade to drive the United States from the Arabian Peninsula.

Al-Bahri, Hamdan and the rest of the group made their way back through Afghanistan to bin Laden's home in Farm Hada, a village outside Jalalabad, not far from the Khyber Pass. They arrived in late 1996 shortly before Ramadan, the holiest time of year. For three days, bin Laden preached to his prospective recruits about the religious impera-

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

tive of reversing America's corrosive presence in the gulf. Seventeen of the original 35 jihadis decided to stay; Hamdan and al-Bahri were among them.

For the next several years, both men worked for bin Laden, first in Farm Hada, then, when he relocated for security reasons in 1997, to a better-fortified compound in the desert outside Kandahar. In 1999, al-Bahri and Hamdan's lives became further entwined. At bin Laden's urging and with his financial help, they married Yemeni sisters in Sana and returned to Afghanistan with their new wives.

By Sept. 11, 2001, however, al-Bahri and Hamdan's paths had diverged. Al-Bahri was in prison in Yemen for his suspected links to Al Qaeda's bombing of an American Naval destroyer, the U.S.S. Cole, in 2000. Hamdan was still with bin Laden, though not for long. In late November 2001, with America's military campaign in Afghanistan well under way, he was picked up near the border of Pakistan by a group of Afghan warlords. They hogtied him with electrical wire and within a matter of days turned him over to the Americans for a $5,000 bounty. The interrogations started, and Hamdan was soon identified as Saqr al-Jedawi, his alias during his years with bin Laden. He spent the next six months in U.S. prison camps in Bagram and Kandahar, before being flown to Guantanamo Bay in May 2002.

Today, Salim Hamdan lives in a 6-by-9-foot cell in Guantanamo, awaiting trial by a special military tribunal established by presidential order in the aftermath of 9/11. If everything goes according to the government's plans, the Bush administration will prosecute Hamdan for violating the laws of war by conspiring to commit acts of terrorism against the United States. The government has revealed little about its case against Hamdan -- my portrait is drawn principally from his lawyers, family members and al-Bahri -- but it has charged him with serious offenses, including transporting weapons and serving as a bodyguard to bin Laden. If convicted on all charges, Hamdan could receive a life sentence.

Hamdan's attorneys, a government-appointed Navy lawyer and a professor at Georgetown University Law Center, don't deny that their client worked directly for bin Laden, but they play down his importance to Al Qaeda, portraying him as an employee, an uneducated and far-from-devout driver and mechanic who was grateful for a paycheck but generally ignorant of the terrorist enterprise for which he worked. Moreover, they say that the tribunals, known officially as military commissions, are illegal and have sued the American government to block them from going forward.

This spring, the detainee's lawyers will have the chance to make their case to the Supreme Court, when it hears Hamdan v. Rumsfeld. The name alone guarantees that it will be one of the most closely watched arguments of the year, and the eventual ruling will have far-reaching implications not just for Hamdan and the rest of the Guantanamo detainees, but also for presidential war powers and quite possibly for the future of democracy in the Middle East. If the war on terror is, at its heart, a battle to show the Islamic world that there is an alternative to oppressive theocracies and autocratic dictators, nothing is more important than how the United States government dispenses justice to detainees like Salim Hamdan. Until now, America's wartime practice has been to hold onto captured combatants until the end of hostilities, when there is no longer a threat of them returning to the battlefield. In this case, though, the battlefield is unmapped and the hostilities could continue for decades. For the moment, the government has broadly classified nearly all of the more than 500 detainees at Guantanamo as enemy combatants, but eventually it's going to have to start sorting them out. This will entail answering some difficult questions. Are all Muslim men who answered the call to jihad equally guilty? Which detainees represent a threat to the United States? Who is worth prosecuting, and how?

Just outside the Old City of Sana, a maze of densely packed, intricately adorned stone houses and centuries-old shops that rise like drip castles from narrow cobblestone streets, sits the modern Martyrs' Mosque. If the Old City evokes Yemen's prosperous, cosmopolitan days at the center of the world's spice trade, the Martyrs' Mosque, an imposing, ash-colored monolith, speaks to its present as the poorest and most primitive of the Arabian Peninsula states.

The big open square that fronts the mosque is a gathering place for the dispossessed. Homeless people lie on flattened cardboard boxes with gasoline cans repurposed as water jugs beside them. Dababs, minivans stuffed with passengers, career around Sana's crowded streets, jockeying for fares. Drivers struggle to be heard above the music issuing from loudspeakers on the three-wheeled cycles pedaled by cassette vendors. The smells of grilling meat and corn on the cob commingle with perfumed oil, urine and exhaust.

There are no women in sight here, only young men and boys, a reflection of Yemen's conservative Islamic culture. And although roughly 40 percent of all Yemeni men are unemployed, everyone here seems to be in a big hurry, hustling around, often holding hands, always in standard Yemeni dress: sandals, white robes and Western-style blazers with the labels showing on the outside of the left sleeve, just above the cuff. Long curved daggers known as jambiyas, reminders

Case 1:05-cv-02380-UNA     Document 9-9     Filed 01/18/2006     Page 4 of 11

Page 3
The Bush Administration vs. Salim Hamdan  The New York Times January 8,

of the country's enduring tribal culture, hang from belts. Cheeks bulge with khat, which brightens the mood and sends the mind in every direction, an apt emblem of the combination of aimlessness and restlessness on display.

Ten years ago, Salim Hamdan was one of these men. He was born in about 1970 (no one, including Hamdan himself, knows for sure), hundreds of miles from Sana in the Wadi Hadhramaut, a 100-mile oasis in the mountainous desert of southeastern Yemen. His father was a farmer and shopkeeper, and the family lived modestly in a small, mud-brick home in a cliff town overhanging the fertile valley below. He was still a child when his parents died from illness, one a few years after the other. With no other family nearby, Hamdan went to live with relatives in Mukalla, a bleak port city of about 150,000 on Yemen's southern coast. By that point, Hamdan had already quit school, which is not unusual in Hadhramaut, where the imperatives of helping your family earn money far outweigh the comparatively abstract virtues of an education.

Within a few years he was on his own, living on the streets of Mukalla and working odd jobs. In 1990, Yemen, which had long been divided into two separate nations, the Islamic north and Marxist south, was officially unified. Hamdan, who was then 20, joined the mass migration north in search of work. There was a widespread sense that Sana, the new nation's capital, would soon be booming. As it turned out, the job prospects were not so promising, particularly for someone with Hamdan's limited qualifications. He soon found his way to the Martyrs' Mosque -- where he picked up work driving a dabab -- and then, six years later, to jihad.

Jihad -- literally, "struggle" -- is a slippery concept, one that has been subjected to almost endless interpretation, violent and nonviolent alike, emanating from a Muslim's basic religious duty to encourage the spread of Islam. In recent years, though, it often has come to be understood as a violent religious crusade against the United States. Hamdan and al-Bahri's routes to jihad could not have been more different, but in many ways each is emblematic of the men's respective countries, which represent the two biggest contingents at Guantanamo. In Saudi Arabia, jihad resonated with particular force with the educated, affluent and devout; in Yemen, it exerted an especially strong pull on the country's poor. Nearly half of the country's population lives below the poverty line; unlike its neighbors in the gulf, Yemen has very little oil, and what it does have is hoarded by the government. "Unless they are the sons of sheiks or political leaders, the young people have no way to use their energies," Nabil al-Sofee, a former spokesman for Islah, Yemen's Islamic party, told me recently in his office in Sana. "The one option that is in front of anyone who wants to achieve anything is jihad."

Jihad has an almost mythic appeal in Yemen. Its roots run all the way back to the seventh century, when the Prophet Muhammad is said to have declared, "Allah, give me fighters from behind me," his back turned conspicuously to Yemen. In its more modern incarnation, jihad can be traced to 1967, when Yemen was still divided and the British withdrew from its southern half. Finally free of its longtime occupiers, South Yemen quickly established ties to the Soviet Union, Cuba and China, and in 1970 became the Arab world's first Communist state.

South Yemen's new identity inaugurated two decades of hostilities with North Yemen, a Muslim state whose allegiances were to Saudi Arabia and Egypt. It didn't take long for North Yemen's rulers -- including the president of today's unified Yemen, Ali Abdullah Saleh -- to exploit the conflict's religious undertones. By the time the Soviets invaded Afghanistan in 1979, many young North Yemenis already accepted that it was their duty as Muslims to confront Communist unbelievers. And so, over the next several years, scores of young Yemeni men answered their clerics' calls for jihad. Afghanistan's mujahedeen received support from many Arab countries, in addition to the United States, but the Yemenis were among the fiercest of the so-called Afghan-Arab fighters. Unlike the jihadis from wealthier states in the Persian Gulf, they were accustomed to hard living, and the rugged, mountainous terrain of Afghanistan was similar to that of Yemen.

When the Soviets withdrew from Afghanistan in 1989, the leaders of many Arab countries, understandably worried about the combustible mix of religious zealotry and combat experience in which these men had been steeped, discouraged the jihadis from returning home. North Yemen, for its part, not only welcomed back its own fighters, it opened its borders to jihadis from other Arab countries as well. The heroic stature of these fighters was cemented in 1994, when the still-simmering tensions between Yemen's Islamists and Marxists erupted into a full-fledged civil war and President Saleh called on the ex-jihadis to help defeat the Communists. The north emerged victorious, and Saleh rewarded many of these men for their efforts. For his help mobilizing the troops, Sheik Abdul Majid al-Zindani, an ex-Arab-Afghan warrior and bin Laden's onetime spiritual mentor, was awarded the chancellorship of Iman University in Sana, a platform from which he has since steered countless young Yemeni men toward the path of jihad.

The Yemeni government did little to stanch the flow of jihadis, even in the face of increasing international pressure. A consummate pragmatist, President Saleh gave the U.S. permission to use its ports to refuel in the 1990's, but to the Arab world he presented himself as a leader who was not afraid to stand up to the West. In the wake of the attack on

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

the U.S.S. Cole in Yemen in 2000, Saleh scoffed at rumors that the U.S. was planning to intensify its military presence in the country: "Yemen is a graveyard for the invaders," he told Al Jazeera. After 9/11, however, President Saleh went to Washington to pledge his support for the war on terror. But having spent so many years nurturing and exploiting the country's culture of jihad, he had to be careful about how he went about dismantling it. Extraditing Islamic radicals, or even putting them in jail for more than a couple of years, would provoke the country's powerful extremist element.

The centerpiece of Saleh's solution was to appoint a respected jurist and cleric, Hamoud al-Hitar, to meet with imprisoned extremists and persuade them that Islam does not, in fact, condone acts of terrorism. When I visited al-Hitar at his heavily guarded home in Sana one night last fall, he explained to me how the so-called Committee on Thoughtful Dialogue works. He called it "intellectual surgery" and described it as a simple process: he leads radicals through a series of questions about their beliefs, using the Koran or the hadith, a collection of the Prophet Muhammad's teachings, to show them how they have been misled. At the end of the program, those participants who vow not to take part in future acts of terrorism are granted presidential pardons and set free. To the obvious question -- Why believe that they'll honor the vow? -- Judge al-Hitar gave the obvious answer: These are men who take their ideology seriously; they would never sign a pledge renouncing their beliefs if they didn't mean it. A couple of years ago, President Saleh released hundreds of men with connections to Al Qaeda under the auspices of Judge al-Hitar's dialogue program. One of those men was Nasser al-Bahri.

Al-Bahri declined to see me for the better part of the two weeks I spent in Yemen. Then, the night before I was scheduled to fly home, he agreed to meet me the following evening at a relative's home in Sana. A tall, rangy man with a receding hairline and a neatly trimmed beard, al-Bahri looked older than his 33 years. He sat on a floor cushion, his long legs extending from the bottom of his creaseless white robe. Early in our conversation, which lasted more than five hours, the power failed. For the rest of the night, the narrow room was illuminated by two candles. Al-Bahri apologized for excusing himself repeatedly to urinate, explaining that he was diabetic.

According to al-Bahri, his decision to renounce Al Qaeda and terrorism had nothing to do with Judge al-Hitar's dialogue program, which he doubts has truly changed any minds. Rather, he said that during his two years in prison in Yemen, almost half of which was spent in solitary confinement, he had the chance to do a lot of reading and thinking. He continues to believe that America is oppressing and exploiting Muslims, but he no longer accepts that the random murder of innocent people is a legitimate expression of jihad, which, he said, "has its time and place, like prayer." There was also the issue of maturity. "When we reach our 30's, we come to regret what we did in our 20's," he told me matter-of-factly, like an ex-campus radical reflecting on a minor act of civil disobedience in his distant past.

Al-Bahri was not eager to talk about Hamdan; because he feels responsible for his brother-in-law's fate, he said that discussing him was too depressing. Not surprisingly, what he did say distanced Hamdan from the military operations of Al Qaeda. Al-Bahri described Hamdan as almost childlike, a cheerful, simple-minded man. According to al-Bahri, Hamdan at first seemed excited about jihad, but he lacked both the zeal of a holy warrior and the religious grounding or inclination to grasp the ideology of the movement. As al-Bahri tells it, Hamdan went to Tajikistan for jihad but stayed in Afghanistan because working as a driver and mechanic in bin Laden's motor pool paid better than driving a dabab in Sana.

If al-Bahri was quick to exonerate Hamdan, he showed no hesitation implicating himself as a senior member of what may be the most notorious terrorist organization the world has ever known. Al-Bahri sounded neither nostalgic nor remorseful talking about his years as one of bin Laden's chief bodyguards; he could have been a retired executive dispassionately recollecting his years with the firm. Yet he was, in one sense, cautious: while he was willing to answer any question I asked, he explicitly disassociated himself from each specific attack that took place during his time with bin Laden.

Al-Bahri's future had come into focus as a teenager in Jidda, when he first fell under the influence of radical Saudi clerics. "I saw that my function was to carry guns and defend Muslims wherever they were," he told me. "That was the holy work that would lead me to paradise." Having grown up in Saudi Arabia, Islam's holiest land, he responded personally when he heard bin Laden describe his country as an agent of the Americans and pledge to drive America from the Arabian Peninsula. What's more, al-Bahri had left Saudi Arabia for Bosnia in the early 90's and had been without the guidance of a religious leader ever since. In bin Laden, al-Bahri said, he had found "a new spiritual father."

Al-Bahri rose quickly through the ranks of Al Qaeda. Under the alias Abu Jandal, he helped create new training camps that bore little resemblance to the kind he attended as a young man in Bosnia, where jihadis learned such conventional skills as assembling and firing weapons and reading maps. The focus now was on fighting in cities and preparing for martyrdom operations, which meant learning how to blend in with local populations and attack civilian targets. Bin

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

Laden was clear about the goals. "He would say over and over again that we must carry out painful attacks on the United States until it becomes like an agitated bull," al-Bahri recalled, "and when the bull comes to our region, he won't be familiar with the land, but we will." During the late 90's, al-Bahri fought with the Taliban against the Northern Alliance and served as one of bin Laden's personal bodyguards during his frequent tours of Qaeda training camps around Afghanistan.

After the attacks on the U.S. embassies in East Africa in the summer of 1998, al-Bahri said, bin Laden placed him in charge of the organization's guest houses in Kabul and Kandahar, where it was his duty to help inspire and train new recruits to undertake terrorist operations against the United States. It was at this point, al-Bahri says, that he started having second thoughts about Al Qaeda, not because he doubted its mission, but because he wasn't convinced these recruits were prepared to carry it out.

Jihad, it occurred to al-Bahri, had evolved from a genuine religious mission to a cattle call for any and all Muslims. Even years later, having renounced terrorism, he seemed irritated by what he characterized as Al Qaeda's failures of management. "We were getting young people who were not committed to jihad, also very young people, 15 or 16 years old," he told me. "What could we do with them? I said we should accept only religious young people. Only the religious understand what jihad means. But my voice was not being heard." Al-Bahri told me that bin Laden knew he was becoming disillusioned, and that's why he encouraged him and Hamdan to marry sisters in 1999; in al-Bahri's interpretation, by tying him to Hamdan, who had fewer options and was thus less likely to leave, bin Laden would have a better chance of keeping al-Bahri in the fold.

During the summer of 2000, Hamdan and al-Bahri came back to Sana for a brother-in-law's wedding. Within a matter of weeks, several Qaeda operatives in a small boat filled with explosives rammed the U.S.S. Cole, which was on a refueling stop in Yemen. Shortly after the attack, Yemeni intelligence agents started rounding up suspected extremists. Al-Bahri tried to flee but was arrested at the airport trying to return to Afghanistan. Hamdan had already taken his wife and her parents on a pilgrimage to Mecca, and word quickly reached him in Saudi Arabia that if he came back to Yemen he'd be picked up, too. Instead, he went back to bin Laden, taking his wife with him.

In the wake of Sept. 11, al-Bahri told me, three F.B.I. agents came to the prison where he was being held in Yemen to interrogate him. The transcripts from their interviews are classified, but al-Bahri says they were mainly interested in the structure and ideology of Al Qaeda. Asked if bin Laden had access to chemical or nuclear weapons, al-Bahri replied that bin Laden had something far more powerful: men who are determined to complete their covenant with God and carry out martyrdom operations against the United States.

Detainees' lawyers estimate that there are currently about 100 Yemeni prisoners in Guantanamo. If even a fraction of this many Americans had been imprisoned in a foreign country for four years, the vast majority without charges, there would be a national outcry. In Yemen, however, most of the detainees' families are completely in the dark. Half of the people in the country are illiterate. Those who can read find few stories about Guantanamo. Many of the papers are state-run, and the rest are under intense pressure to toe the government line. President Saleh knows that drawing attention to the detainees would only further inflame anti-American sentiments and in so doing create more problems for him.

A Yemeni human rights group called HOOD has a rough list of Yemenis who are being held at Guantanamo and has made contact with some of their relatives, but the families are not in communication with anyone in the U.S. government. The detainees' defense lawyers periodically come to Yemen to meet with the families who have authorized them to represent their relatives, though in some cases the detainees themselves doubt their American lawyers' good intentions. While I was in Yemen, I spent several days visiting the families of detainees with David H. Remes, a partner at the Washington firm Covington & Burling, which represents 17 of the Yemenis at Guantanamo. Remes prefaced several of his meetings by saying that their sons, brothers or husbands would be very angry if they knew he was there.

Hamdan, too, sent word through his lawyers that he didn't want me to contact his family, but I was able to get in touch with his wife's brother, Muhammad al-Qala, through HOOD. Al-Qala, a staff sergeant in the Yemeni army, invited me to his home to meet his sister, Hamdan's wife, Um Fatima. Since her husband's arrest, she and her two daughters have been living with her brother, his family and their mother in a cramped two-story stone house in central Sana. Hamdan's lawyers came to Yemen about a year and a half ago to see her, and the lawyer's interpreter is in fairly regular contact with al-Qala, but no one whom Hamdan left behind seems to have any real sense of the gravity of his situation or the significance of his case: what could a superpower like the United States possibly want with Salim?

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

Sitting perfectly straight on the shiny, floral-patterned blue floor cushions that lined the small upstairs living room in her brother's home, Um Fatima spoke for three hours through an interpreter about her husband. Al-Qala, a stocky man with a dark mustache and glassy, expressionless eyes, sat beside her chain-smoking Marlboros and working on a big wad of khat. Um Fatima and Hamdan's two daughters, 6 and 4, raced in and out in T-shirts and sweatpants. Um Fatima's full-length covering revealed only her eyes, but the difficulty of talking about her husband was evident; several times, she became so upset that she had to excuse herself and leave the room.

Um Fatima and Hamdan were married in Sana in 1999. She had not met him before their wedding day but was nevertheless a happy bride. They stayed in Sana for a few months before returning to Afghanistan. Um Fatima was reluctant to go, and was shocked at the conditions once they arrived. Their mud-brick home had dirt floors and no running water or electricity. It was also remote: Tarnak Farms, the walled Qaeda complex in which they lived, was tucked into a vast expanse of treeless desert and brush about 30 minutes outside Kandahar. Um Fatima's days were spent alone inside the house with her infant daughter. Hamdan, she told me, would return in the early evenings, often with clothes stained with grease from his work fixing the various cars and trucks used on the farm. Um Fatima said she would occasionally complain to him about their life there. "Salim would always tell me to be patient, that someday we would return to Yemen," she said.

In her telling, Um Fatima was doing hardship duty for a few years so that her husband could earn good money working for a sheik she'd never heard of. Even now, years later, the fact that she had lived inside the walls of a heavily fortified Qaeda compound while her husband worked for the most infamous terrorist of our time does not seem to have penetrated her version of reality.

Um Fatima last saw her husband on Nov. 24, 2001. She was eight months pregnant. At the time, U.S. forces were closing in on Kandahar, the Taliban's last stronghold in Afghanistan. Hamdan, who had been away for a couple of months with bin Laden, had recently returned to take Um Fatima and their daughter to Pakistan. In a borrowed car, with American B-52's circling the skies overhead, they made their way through the Maruf mountains toward the border. Hamdan decided to let Um Fatima cross into Pakistan alone; security was tight, and even if the border guards had no idea that he worked for bin Laden, being a Yemeni man trying to leave was enough to cause suspicion. He told her he would find another way through and come find her in a few days.

Over the course of the next few weeks, as Um Fatima traveled deeper into Pakistan in the back of a pickup truck with a group of Afghan refugees, she gradually lost hope that she would ever see her husband again. Entering her ninth month of pregnancy, she became so hysterical, she told me, that some sympathetic strangers in Karachi bought her a plane ticket home. At the airport in Sana, she was interrogated for five hours about her husband's whereabouts. Um Fatima said she assumed he was dead.

Two and a half months later, she received a letter from him on International Committee of the Red Cross stationery. "My sweetheart, peace and blessings be upon you," it began. "I did not die. Allah prescribed a new life for me. Now I am a detainee with the Americans.. . ."

Um Fatima showed me all of the letters she has received from Hamdan since then. Later that night, the interpreter who read the dozen or so letters to me told me how unusual they were. Yemeni men tend to be commanding and aloof with their wives. Hamdan's letters are emotive, like those of a longing schoolboy. There are drawings of his dagger ("please take care of my jambiya for me"), simple poems ("the bird danced and the bird sang. . .") and the promise to "see each other very, very, very, very, very soon, God willing."

In a three-page military order issued on Nov. 13, 2001, President Bush authorized the special tribunals before which Salim Hamdan and other non-American enemy combatants are to be tried. The trials will held in Guantanamo before panels of three to seven military officers selected by an administration appointee. Two-thirds of a majority will be required for non-death-penalty convictions. (A death sentence requires unanimity.) These are war-crimes tribunals, though unlike the recent international tribunals in Rwanda and the former Yugoslavia, the list of offenses pertain to acts of terrorism rather than genocide.

The administration opted for these special tribunals over the U.S. criminal courts for a number of practical reasons. Broadly speaking, certain rights that would be considered fundamental in a civilian court wouldn't apply. If defendants were suspected terrorists, for instance, they couldn't very well be permitted to see all the evidence against them as some of it would no doubt be classified for national-security reasons.

Practical considerations aside, the creation of the nation's first war-crimes tribunals since World War II sent a symbolic message, putting the war against Islamic extremism in the same class as the war against Nazism. Moreover,

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

the tribunals fit with the Bush administration's larger strategy to reassert and expand presidential authority in the after-math of 9/11. The executive branch would have complete control. Not only was Congress -- the body empowered by the Constitution to convene military tribunals -- left out of the decision to establish them, but it also wasn't consulted on how the tribunals would work. Instead, the administration's lawyers wrote all of the rules, from the composition of the panels to the standards for admissible evidence to the definition of a war crime. The judiciary branch was also cut out of the process: contested verdicts would be reviewed not by a federal court of appeals but by a three-member panel picked by Defense Secretary Donald H. Rumsfeld.

The first batch of defendants for the tribunals, Hamdan and three others, were carefully selected and then repeat-edly vetted on their journey up the chain of command. Case summaries were passed from the military lawyers assigned to the prosecution team to the Pentagon's adviser for the tribunals to Paul D. Wolfowitz, then deputy defense secretary, to President Bush. Hamdan was originally slated to be the first Arab tried.

While the government has not accused Hamdan of being a member of Al Qaeda per se, it does say that he picked up and delivered weapons for use by Qaeda associates, trained at a Qaeda camp and served as a bodyguard and driver for bin Laden. The formal charge being brought against him is conspiracy, which the administration defines as having "joined an enterprise of persons who shared a common criminal purpose." In a sense, the conspiracy charge is a logical one for prosecuting members of organizations like Al Qaeda that deliberately subdivide tasks and inform very few people about operations. "To capture the nature of some enterprises, to deconstruct what makes them effective, you have to focus on the different kinds of contributions, from the target spotter to the weapons transporter to the financier," says Ruth Wedgwood, a law professor at Johns Hopkins who helped the Pentagon revise some of the rules for the tribunals.

In the U.S. criminal courts, conspiracy is especially popular among prosecutors going after organized-crime rings; it gives them leverage to lean on foot soldiers to testify against their superiors. In the context of war-crimes tribunals, however, conspiracy becomes more complicated. Because it can be applied to people at every level, it can create a moral equivalence between low-level players and leaders. This very issue came up at Nuremberg, when an assistant attorney general in the Roosevelt administration attacked a Pentagon proposal to file conspiracy charges against German foot soldiers because it might, in the world's eyes, weaken the impact of the charges against the Nazi leaders. (The pro-posal was never adopted.) What's more, because conspiracy is such a broad, catch-all charge, it's an easy one for prose-cutors to fall back on when their proof of guilt is thin. The U.S. criminal-court system has numerous protections against this -- jury trials, judges who are insulated from politics, access to an independent court of appeals -- most of which are absent from the tribunals. "In the American criminal system, we can have a conspiracy doctrine because we have this unique set of vibrant protections," says Neal Katyal, a Georgetown law professor, the architect of Hamdan's lawsuit against the Bush administration and a champion of the conspiracy charge in the criminal context. "But when it comes to war-crimes trials, the international consensus is that conspiracy is a no-no. When the U.S. Congress itself defined war crimes in two statutes in 1996 and 1997, it didn't include conspiracy."

Brig. Gen. Thomas L. Hemingway, an Air Force judge advocate general who is currently serving as the Penta-gon's adviser on the tribunals, wouldn't discuss the government's evidence against Hamdan other than to point out that the prosecution has already given the defense 18,000 pages of discovery, including incriminating photographs and summaries of Hamdan's numerous statements to interrogators. "You want a one-word characterization of the case against Hamdan?" General Hemingway asked me. "Solid."

The government is certainly aware that the first trials will be closely scrutinized, and it seems improbable that it would choose a case that wasn't airtight. Hamdan's story also has narrative appeal. Unlike the vast majority of enemy combatants, who came to Afghanistan with the cresting wave of jihadis after 1999, he worked for bin Laden from 1996 until his capture in November 2001, a stretch of time that spanned not just 9/11 but also the 1998 attacks on two U.S. embassies in East Africa and the 2000 bombing of the U.S.S. Cole. And while many jihadis never even met bin Laden, Hamdan has not disputed working directly for him. A skilled prosecutor could turn his trial into the history of Al Qaeda's decade-long war against America and in so doing illuminate the nature of our enemy; the tribunals will be open to the press, except for when classified evidence is presented. Whatever evidence the government may have against Hamdan, it's hard to believe he could have worked for bin Laden for five years, through several high-profile terrorist attacks, without the knowledge of Al Qaeda's intentions or bin Laden's trust. And given that he has admitted to being a driver, the progression to transporting weapons is hardly a leap.

Yet it seems clear that Hamdan was not a high-ranking officer of Al Qaeda. By the time the United States decided to try him in 2003, there were certainly people in custody suspected of more serious crimes. Why not prosecute the more heinous offenders first? The government won't discuss how it settled on Hamdan, but it's easy to make some logi-

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

cal inferences. It stands to reason that the more hard-core the suspected terrorist, the more useful the information he possessed. The government may not have been done questioning the "highest value" detainees when it decided to issue its first indictments. (Hamdan's once-regular interrogations, which started almost immediately after his arrest and continued for the better part of two years, ceased in early 2004, shortly before the government announced that he'd been selected for trial.) The United States was also entering uncharted waters with the tribunals; terrorism is not yet codified as a war crime in international law. It's possible that the government wanted to wait to try its most prized detainees until it had the opportunity to test its legal theories on smaller players.

The treatment of the prisoners may have been a factor as well. Lawyers for the administration had long since built their legal defense of coercive interrogations. Nevertheless, for the first tribunals the government may have wanted "clean" -- as in not mistreated or tortured -- defendants, both to avoid embarrassment and to prevent issues about the veracity of their statements to interrogators. This, however, is not a point that Hamdan's lawyers intend to concede. Hamdan has already implied in an affidavit that some of his statements were coerced. He says he was punched and kicked after failing to answer certain questions, and that one of his interrogators placed a pistol on the table between them during their sessions.

In late November, a few weeks after the Supreme Court agreed to hear Hamdan v. Rumsfeld, Hamdan was moved from his regular cellblock in Camp Delta to a separate, smaller cellblock called Tango. When his lawyers learned about the development in early December, they were not pleased. Not only had Hamdan's relocation violated the explicit order of a federal judge that he be kept among the general population at Delta, but he also would be right next to Ali Hamza Ahmed Sulayman al-Bahlul, a supposed Qaeda propagandist with a reputation for turning other detainees against their U.S. attorneys. "He's getting put with a known advocate for firing lawyers -- against a federal order -- and I don't even get told about it?" Katyal's co-counsel, Navy Lt. Cmdr. Charles Swift, told me after Hamdan's move. Swift and Katyal promptly filed an emergency motion to have their client returned to a normal cellblock, and the authorities at Guantanamo complied.

Many detainees assume that their lawyers are American spies, a suspicion fed by the fact that nearly every document or letter that they bring in or take out of the camp has to pass through military censors. Hamdan's lawyers say they have a good relationship with him; still, they worry about losing him to what they consider to be the prison's more radical element. So while Katyal plots strategy from his office near Capitol Hill in Georgetown, Swift, a voluble, boyish-looking 44-year-old Navy JAG, shuttles back and forth to Guantanamo Bay with their interpreter, Charles Schmitz, a soft-spoken professor of geography and an expert in Yemeni culture, to reassure their client that they are on his side and to persuade him to have faith in a legal system that he doesn't understand.

It was hard enough for Swift, who was appointed by the government, to earn Hamdan's confidence when he first started meeting with him -- in his Navy uniform -- in early 2004; he now finds himself having to constantly earn it back. As the indefinite detentions of hundreds of Muslim men, many of whom were already predisposed to Islamic extremism, enters its fifth year, Guantanamo is turning into an anti-American hothouse. For the government, the radicalization of Guantanamo is a complicated issue. The main form of protest in the camps is the hunger strike, and a prisoner's starving himself to death would turn Guantanamo, already a public-relations problem, into a full-scale disaster. (As of Dec. 30, more than 30 detainees had been hospitalized and were being force-fed.) Radicalization also undermines one of the principal goals of imprisonment: deterrence. As Guantanamo's critics like to say, "If you weren't a terrorist when you went in, you will be when you're let out."

But radicalization has its advantages for the Bush administration too. Last summer, some detainees told their American lawyers that they would no longer meet with them, and a number went so far as to formally fire them. The government considers the legions of adversarial defense attorneys working pro bono for the detainees -- from corporate lawyers to human-rights lawyers to law professors -- to be an impediment to their ability to prosecute the war on terror. Among other things, the lawyers have filed hundreds of habeas corpus petitions in order to challenge their clients' continued detention without recourse.

More broadly, radicalization helps validate Guantanamo's existence. The more anti-American the detainees become, the greater the danger they pose and thus the more necessary it is to continue to detain them. So when Swift first heard about the decision to move Hamdan next to al-Bahul, he wondered whether it wasn't deliberate. "If they succeed in radicalizing Salim," he said, "then they've justified his trial." (The Pentagon would not comment on why an individual detainee might have been moved.)

Last August, Hamdan joined a prisonwide hunger strike to protest the conditions on Guantanamo. The detainees' numerous demands included the return of religious books that had been taken from them. When Swift next visited

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

Hamdan in late August, he found him unusually intransigent. For two days, Hamdan refused to meet with him alto-
gether. Not long after Swift returned home to Northern Virginia, he got a call from another lawyer at Guantanamo in-
forming him that Hamdan, a slight man to begin with, had passed out from dehydration in his cell and was taken to the
medical clinic at Delta and put on an IV drip. Swift flew back down to Guantanamo Bay almost immediately and man-
aged to persuade Hamdan to start eating again by appealing to the same sense of solidarity that he says prompted him to
join the strike in the first place. The best way to help his fellow detainees, Swift told him, was not to martyr himself but
to follow through on their challenge to the system.

Like the government, Hamdan's lawyers also see him as much more than a detainee; to them, he represents the
pretext for a historic and unconstitutional presidential power grab. As Hamdan's lawyers and other critics see it, the ad-
ministration, by unilaterally creating the tribunals, defining the offenses and handpicking the panels, is not only denying
detainees fair trials, it is also violating bedrock principles of the American government. To put an even finer point on it,
they say the Bush administration is undermining the very values it purports to be defending in its war against Islamic
extremism. They would like to see Hamdan and other enemy combatants tried before a traditional military court, a pre-
existing legal system approved by Congress with built-in provisions for the complications that arise during wartime.

Katyal, who served as Vice President Gore's co-counsel in the suit over the 2000 election, draws a sharp distinc-
tion between waging war, an act over which the president should have broad authority, and meting out justice. And so,
working at his own expense with research support from a loose network of law students from Georgetown, Yale and the
University of Michigan along with attorneys from the law firm Perkins Coie, Katyal has written more than a thousand
pages of briefs arguing that the president has neither the authority to create the tribunals without explicit Congressional
approval nor the right to deny Hamdan status as a prisoner of war, and in so doing strip him of protections guaranteed
by the Geneva Conventions. "The Geneva Conventions were written precisely to make it difficult for political leaders
facing political pressure to suspend basic rights and P.O.W. protections," Katyal says. "The moment we let a president
say he can determine whether someone is a prisoner of war, other countries are going to start doing it back to us."

Katyal's arguments found traction in federal court in Washington in the fall of 2004. Just as Hamdan's second
round of preliminary hearings were getting under way at Guantanamo, Judge James Robertson, a former Naval officer,
ruled in his favor, declaring the tribunals illegal and abruptly halting the proceedings 30 minutes after they had begun.
In July 2005, however, a three-judge appeals panel that included John G. Roberts Jr., now chief justice of the Supreme
Court, overturned the decision. Katyal and Swift petitioned the Supreme Court for review, and in November, after de-
laying action on the case for several weeks, the court announced that it would hear Hamdan v. Rumsfeld.

This was not the final word, though. No sooner had the Supreme Court agreed to consider Hamdan's case than a
Republican senator from South Carolina, Lindsey Graham, introduced a last-minute amendment to a defense-
authorization bill explicitly denying all Guantanamo detainees habeas corpus rights, or access to the U.S. federal courts.
This had been the administration's intent from the moment it started sketching out its legal strategy in the war on terror
in the aftermath of 9/11, but the last time the issue came before the Supreme Court, in the spring of 2004 in another de-
tainee case, the court ruled against the president (with a loud dissent from Justice Scalia). Now Graham was effectively
interceding on the administration's behalf in what amounted to an end run around the Supreme Court.

Days later, however, Senator Carl Levin, a Michigan Democrat, persuaded Graham to change the wording of the
amendment so that it would not derail pending cases, including Hamdan v. Rumsfeld. It has since passed both the
House and the Senate and at press time awaited the president's signature.

What about the hundreds of detainees who have not yet filed suits protesting their imprisonments? Aside from
trial or continuing detention, the only option for the United States is to send them back to their respective nations. To
date, it has released about 260 men, including a handful of Yemenis, all of whom remain in prison in Yemen, no doubt
at the behest of the Bush administration. But Yemen is an unpredictable ally. In November, the United States suspended
it from an aid program worth hundreds of millions of dollars, citing enduring governmental corruption, fiscal irrespon-
sibility and the failure to enact democratic reform. Meanwhile, Islamic fundamentalism continues to gather strength in
Yemen. Recently, three of the country's best-known extremists, including al-Zindani, one of bin Laden's spiritual men-
tors, called for a new coalition dedicated to confronting Islam's enemies and promoting Muslim values. The ongoing
detention of 100 Yemenis at Guantanamo Bay may only help their cause and increase their leverage with President
Saleh. So the United States finds itself trapped between two unappealing choices: hold these men as the potentially end-
less war against terrorism goes on, or return them to a breeding ground for Islamic radicalism in Yemen.

For his part, Hamdan's immediate concerns have more to do with day-to-day life at Guantanamo Bay — how much
time detainees are permitted to exercise and at what time of day, what books they are allowed to read, what comfort

The Bush Administration vs. Salim Hamdan  The New York Times January 8,

items they are allowed to keep in their cells -- than with the future of his historic lawsuit against the United States government. As Schmitz, his interpreter, told me recently, "The most important thing to him is what we can deliver in the camp, and that is zip."

Shortly after the Supreme Court agreed to hear Hamdan v. Rumsfeld, Swift visited Hamdan's cell armed with several front-page newspaper articles about the development. When Swift delivered the news, Hamdan smiled. Within a matter of minutes, though, his mood had visibly darkened, Swift says. Then Hamdan asked him, "What is this exactly that I've won?"

**URL:** http://www.nytimes.com

**GRAPHIC:** Photos: The Breeding Ground of Jihad: Poverty and piety in the Old City of Sana, Yemen.
Um Fatima, Hamdan's wife, with a photo of her husband and daughter before he was seized by the U.S.
Nasser al-Bahri, who brought Hamdan to bin Laden, today in Yemen. He now says he opposes terrorism.
 Members of HOOD, a Yemeni human rights group, one of the few information sources for families of detainees. (Photographs by Brent Stirton/Getty Images, for The New York Times)

**LOAD-DATE:** January 8, 2006