## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZAKARIA AL-BAIDANY, et al., | |
| Petitioners, | |
| v. | Civil Action No. 05-2380 (CKK) |
| GEORGE W. BUSH, et al., | |
| Respondents. | |

## RESPONDENTS' MEMORANDUM IN OPPOSITION TO PETITIONERS' MOTION FOR PRELIMINARY INJUNCTIONS REQUIRING ADVANCE NOTICE OF ANY TRANSFER OR RELEASE

Respondents hereby respond to petitioners' motion for a preliminary injunction requiring respondents to provide the Court and petitioners' counsel with 30 days' advance notice before any transfer or release of petitioner Al-Baidany from Guantanamo (dkt. no. 9).

At the outset, there are two significant reasons why petitioner's motion should not even be entertained at this time. On December 30, 2005, the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 ("the Act"), became law. The Act, among other things, amends 28 U.S.C. § 2241 to remove court jurisdiction to hear or consider applications for writs of habeas corpus and other actions brought in this Court by or on behalf of aliens detained at Guantanamo Bay, Cuba, and creates an exclusive review mechanism in the D.C. Circuit, applicable to pending cases, to address the validity of the detention of such aliens held as enemy combatants. Id. § 1005(e)(1), (h)(2). In light of this and given the new, statutory withdrawal of the Court's jurisdiction, a stay of all proceedings in these cases, including with respect to petitioners' requests for relief, is appropriate pending the resolution of the effect of the Act. Indeed, because the Act vests "exclusive" jurisdiction in the D.C. Circuit "to determine the

validity of any final decision of a Combatant Status Review Tribunal that an alien is properly

detained as an enemy combatant," id. § 1005(e)(1), it would be inappropriate for the Court to

order relief in the interim that might infringe upon the Court of Appeals' exclusive jurisdiction.

See Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 75, 78-79 (D.C. Cir.

1984) (request for relief in district court that might affect Court of Appeals' future, exclusive

jurisdiction is subject to the exclusive review of the Court of Appeals).  For these reasons,

respondents oppose petitioners' request for relief.

Indeed, our understanding is that it is the sense of the Court that it wishes to await

anticipated guidance from the D.C. Circuit regarding the effect of the Act before deciding any

pending motions.[1]  Accordingly, absent further direction from the Court, respondents should not

be required to submit a further substantive response to the present request for relief.

Nonetheless, in an abundance of caution regarding this understanding, respondents also oppose

petitioners' request for relief for the reasons discussed below.

Second, as we previously explained in Respondents' Memorandum in Opposition to

Petitioners' Motion for Entry of Protective Orders and for Immediate Award of a Writ of Habeas

Corpus or Issuance of an Order to Show Cause (dkt. no. 8; filed Jan. 17, 2006), at 2-13, this

petition is defective on its face insofar as it purports to be brought through a next friend who is

another Guantanamo detainee and contains not a trace of information to suggest that the

governing requirements for next friend standing, see Whitmore v. Arkansas, 495 U.S. 149, 163-

---

[1] The effect of the Act is being addressed in supplemental briefing in the Guantanamo detainee appeals pending before the D.C. Circuit.  Pursuant to an order issued by the D.C. Circuit on January 27, 2006, respondents are to file a brief by February 17, 2006, petitioners are to file briefs by March 10, 2006, and respondents are to file a reply brief by March 17, 2006, with oral argument occurring on March 22, 2006.

64 (1990), are met.[2]  As the Court may be aware, in a number of similarly defective cases, respondents have filed motions for an order to show cause why the case should not be dismissed for lack of standing, which motions have been transferred to Judge Oberdorfer for adjudication. If necessary, respondents will file a similar motion in this case.  In any event, it is not appropriate for the Court to grant affirmative relief in a case that is jurisdictionally deficient on its face.

For those two reasons, it is inappropriate to reach the merits of petitioner's motion at present.  In the event the merits of petitioners' motion must be reached at some point in the future, it should be denied for the reasons set forth below, which are common to all of the many similar motions that have been filed in the Guantanamo detainee cases.[3]

---

[2] The sole basis alleged for next-friend standing is an unsigned, undated note, purportedly from the putative next friend, saying, "This is an authorization to somebody I know."  Petition, Ex. A.  This is plainly insufficient to comply with the requirements of Whitmore.  In their January 27, 2006 reply brief (dkt. no. 10), petitioners' counsel indicate that they are engaged in efforts to learn more about the putative next friend's relationship with the petitioner, and/or to contact relatives or petitioner who they may enlist as a proper next friend.  Of course, at such time as petitioners' counsel cure the standing defect and present a properly authorized habeas petition, they may renew the instant motion.

[3] Similar motions have been filed over the past year in numerous other Guantanamo detainee habeas cases, with varying results.  Compare, e.g., Sameur v. Bush, Civ. A. No. 05-1806 (CKK), slip op. (D.D.C. Nov. 17, 2005) (ordering advance notice as part of stay), with Abdah v. Bush, Civ. A. No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (granting preliminary injunction), with Kurnaz v. Bush, Civ. A. No. 04-1135 (ESH), 2005 WL 839542 (D.D.C. Apr. 12, 2005) (granting preliminary injunction only as to transfers other than for release), with Deghayes v. Bush, Civ. A. No. 04-2215 (RMC) (D.D.C. June 15, 2005) (denying preliminary injunction but requiring notice to the Court of any decision to transfer a particular individual to a particular country), with Almurbati v. Bush, 366 F. Supp. 2d 72 (D.D.C. 2005) (denying preliminary injunction); Al-Anazi v. Bush, 370 F. Supp. 2d 188 (D.D.C. 2005) (same); Mammar v. Bush, Civ. A. No. 05-573 (RJL), slip op. (D.D.C. May 2, 2005) (same); Attash v. Bush, Civ. A. No. 05-1592 (RCL), slip op. (D.D.C. Sept. 1, 2005) (same).  Respondents have taken interlocutory appeals of the orders requiring advance notice.  No orders declining to institute an advance notice requirement have been appealed.

## BACKGROUND

**A.     Detention of Enemy Combatants at Guantanamo**

Following the terrorist attacks of September 11, 2001, pursuant to his powers as

Commander in Chief and with congressional authorization, see Authorization for Use of Military

Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States

Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime and

others that had supported it.  In the course of those hostilities, the United States has captured or

taken custody of a number of foreign nationals as enemy combatants, some of whom are being

held at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba.

**B.     Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo**

Although the laws of war permit the United States to hold enemy combatants in detention

for the duration of hostilities, the United States has no interest in detaining any individuals longer

than necessary.  See Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs

Matthew C. Waxman dated June 2, 2005 ("Waxman Decl.") ¶ 3; Declaration of then Ambassador

Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl.") ¶ 2.[4]  The Department of Defense

("DoD") conducts at least annual reviews of each Guantanamo detainee to determine whether

continued detention is warranted based on factors such as whether the detainee continues to pose

---

[4] The June 2, 2005 Waxman Declaration submitted herewith replaces and supersedes two prior declarations by Deputy Assistant Secretary Waxman submitted in connection with similar motions in other Guantanamo detainee cases.  See Waxman Decl. ¶ 1.  The Prosper Declaration submitted herewith was originally submitted in connection with a similar motion in Abdah, Civ. A. No. 04-1254 (HHK).  While Mr. Waxman and Mr. Prosper have both recently left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to the instant case.  Certain numerical information in the declarations is subject to updating.  See infra note 6.

a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  Those

annual reviews include those currently being conducted through Administrative Review Boards.

See Waxman Decl. ¶¶ 3, 7.[5]  As part of the Administrative Review Board process, counsel who

represent detainees have been invited to make written submissions concerning whether further

detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised,

any concerns about transfer or repatriation, and have in fact made such submissions.

Following consultation with various agencies, a senior Department of Defense official

grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another

government.  Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  Almost 250 Guantanamo detainees

have been so transferred, over a period spanning several years.  Waxman Decl. ¶ 4; Prosper Decl.

¶ 2.[6]

Where continued detention by the United States is not warranted, a detainee may be

transferred to the control of another government, typically the government of his country of

citizenship, for release.  Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.  The United States also transfers

Guantanamo detainees, under appropriate circumstances, to the control of other governments for

_____

[5]  See generally Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, available at <<http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf>>; Memorandum dated September 14, 2004, re: Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, available at <<http://www.defenselink.mil/news/Sep2004/ d20040914adminreview.pdf>>.

[6]  As an update to certain information provided in the attached declarations, at last count, 256 detainees have been transferred by the Defense Department from Guantanamo, of which 180 were transferred for release.  See Department of Defense News Release, "Detainee Transfer Announced," Nov. 5, 2005, available at <<http://www.defenselink.mil/news/detainees.html>>.

continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Such transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, that will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by the Department of Defense to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

In any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations. Prosper Decl. ¶ 4;

Waxman Decl. ¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once the Department of Defense approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate for the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant. Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the State Department are

developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the State Department's annual Country Reports on Human Rights Practices) and

the relevant State Department regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, State Department officials consider the

identity, position, or other information concerning the official relaying the assurances; political or

legal developments in the foreign country concerned that provide context for the assurances; and

the foreign government's incentives and capacity to fulfill its assurances to the United States.

Prosper Decl. ¶ 8.  In an appropriate case, the State Department may consider various monitoring

mechanisms for verifying that assurances are being honored.  Id.  If a case were to arise in which

the assurances obtained from the receiving government were not sufficient when balanced

against treatment concerns, the United States would not transfer a detainee to the control of that

government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7; Prosper Decl. ¶

8.  Indeed, circumstances have arisen in the past where the Department of Defense decided not to

transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶

7; Prosper Decl. ¶ 8.

        The United States' ability to seek and obtain assurances from a foreign government

depends on its ability to treat its dealings with the foreign government with discretion.  Prosper

Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously, diplomatic sensitivities surround the Department of

State's communications with foreign governments concerning allegations relating to torture.

Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  The United States Government typically does not

unilaterally make public any specific assurances or other precautionary measures obtained,

because such disclosure would have a chilling effect on and cause damage to our ability to conduct foreign relations. Prosper Decl. ¶ 9. If the United States Government were required to disclose its communications with a foreign government relating to particular mistreatment or torture concerns outside appropriate Executive Branch channels, that government and potentially other governments would likely be reluctant to communicate frankly with the United States concerning such issues in the future.[7] Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8. As a result, disclosure could impede our country's ability to obtain vital cooperation from concerned governments with respect to military, law enforcement, and intelligence efforts related to the war on terrorism. Waxman Decl. ¶ 8; Prosper Decl. ¶ 12.

## ARGUMENT

## I.    PRELIMINARY INJUNCTION STANDARD

It is well-established that a request for preliminary injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by

---

[7] Another reason such disclosure would be harmful is that the State Department's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other State Department offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11. Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials. Id.

9

the injunction.'" See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting

CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).

　　In particular, the irreparable harm that must be shown to justify a preliminary injunction

"must be both certain and great; it must be actual and not theoretical." Wisconsin Gas Co. v.

FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Injunctive relief will not be granted against

something merely feared as liable to occur at some indefinite time; the party seeking injunctive

relief must show that the injury complained of is of such imminence that there is a clear and

present need for equitable relief to prevent irreparable harm." Id. (citations and internal

quotation marks omitted; emphasis in original).[8]

---

[8] In several prior cases, this Court has entered the functional equivalent of preliminary injunctive relief as a component of a stay of proceedings related appeals.  As another Judge of this Court has concluded, however, "if the petitioners cannot meet the prerequisites of a motion for preliminary injunction . . . it is unlikely that they should receive that same relief through the backdoor of a stay." Al-Anazi, 370 F. Supp. 2d at 199 n.11 (citing Laborers' Intern. Union of North Am. v. Nat'l Post Office Mail Handlers, 1988 WL 142384, at *1 (D.D.C. Dec. 23, 1988)).

　　Similarly, petitioner suggests that he is entitled to an injunction under the All Writs Act, 28 U.S.C. § 1651, without needing to make the showing required for a preliminary injunction. Petrs' Mem. at 9-11.  However, the primary case on which petitioner relies for that argument expressly cautions that "a district court may not evade the traditional requirements of an injunction by purporting to issue what is, in effect, a preliminary injunction under the All Writs Act." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1101 n.13 (11th Cir. 2004).  The court described as "the textbook definition of a preliminary injunction" one that "prohibited release of [a] list until the court reached a final ruling on the matter . . . . because once the list was released, the case would be moot." Id. (citing Florida Med. Ass'n v. U.S. Dep't of Health, Educ, and Welf., 601 F.2d 199 (5th Cir. 1979)).  Here, petitioner seeks an injunction that prohibits his release on the ground that once released, his case challenging his detention at Guantanamo will be moot – another "textbook" preliminary injunction.

　　Thus, in whatever form of order the inherently-injunctive-in-nature relief petitioner seeks might be embodied, petitioner should be required to satisfy the preliminary injunction standard in order to justify that relief.  In addition, an injunction under the All Writs Act is not appropriate for the reasons stated in Al-Anazi, 370 F. Supp. 2d at 195-96.

## II.     PETITIONER FAILS TO SHOW IRREPARABLE INJURY

### A.     The Mooting of a Habeas Claim that Naturally Flows From Relinquishment of United States Custody Does Not Constitute Irreparable Injury Justifying a Preliminary Injunction

Some Judges of this Court have required advance notice of any transfer through a preliminary injunction or otherwise in order to "protect" or "preserve" the Court's jurisdiction, reasoning that a transfer would or could extinguish the transferred detainee's habeas claims and curtail the Court's review of the legality of his detention.  Respondents respectfully suggest that these decisions rest on faulty logic.  Any right to challenge the legality of one's detention through a habeas proceeding cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.[9]  "The ultimate objective of a habeas petition is release from custody."  Almurbati, 366 F. Supp. 2d at 78.  As Judge Walton found, "once the respondents release the petitioners from United States custody . . . they will have obtained the result requested and at that point there will be no further need for this Court to

---

[9] Transfers of Guantanamo detainees are not undertaken in order to thwart the jurisdiction of the Court.  Waxman Decl. ¶ 3.  Indeed, such transfers have been occurring since October 2002, long before the June 28, 2004 Rasul Supreme Court decision and the proliferation of detainee habeas petitions that it spawned in this Court.  Waxman Decl. ¶ 4.  As another Judge of this Court noted, 131 transfers (i.e., more than half of the transfers to date) had occurred three months or longer before Rasul was decided, "thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer in order to thwart the jurisdiction of the courts."  Al-Anazi, 370 F. Supp. 2d at 196 n.7 (citing Dep't of Defense, Transfer of Afghani and Pakistani Detainees Complete (Mar. 15, 2004), available at http://www.defenselink.mil/releases/2004/nr20040315-0462.htm); see also supra note 5 (citing documents showing that administrative review process for considering transfers and repatriations predates Rasul and the filing of this and most other detainee habeas petitions).

maintain jurisdiction." Id. at 80; see also Al-Anazi, 370 F. Supp. 2d at 198 ("Every habeas

petition, including this one, is ultimately about obtaining release from detention, and where, as

here, the United States will relinquish custody of the detainee to the home government there is

nothing more the Court could provide to petitioners." (citation omitted)).

   That release from United States custody will give petitioner all the relief he can seek

through habeas is not altered by the fact that, upon being released from the custody of the United

States, a former detainee may be taken into custody and detained in the receiving country based

on that country's independent interests and determinations.  As respondents' declarations make

clear, when the Department of Defense transfers detainees to the control of other governments,

the detainees are no longer subject to the custody or control of the United States, and any

subsequent confinement in the receiving country is based on the receiving government's

independent decision, based on its domestic laws, that the individual should be detained.

Waxman Decl. ¶ 5.[10]  The Court should therefore reject petitioner's suggestion that the

possibility of future detention in an individual's home or another country based on that country's

independent interests and determinations constitutes irreparable injury warranting an injunction.

   **B.**  **Speculation that the United States Will Defy its Own**
      **Policy by Transferring Detainees to Countries in**
      **Circumstances Where it is Believed They Will be Tortured**
      **Does Not Warrant a Preliminary Injunction**

   Nor can petitioner carry his burden to show irreparable injury that is "certain and great . . .

actual and not theoretical," Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), by

---

   [10] Even if the United States transfers a detainee to another country with the understanding
that, from the United States' perspective, he can be released, the receiving country is not, and
could not be, prevented from subsequently taking any law enforcement or investigatory action
against the former detainee that it may deem appropriate under its laws.

unhinged speculation that, contrary to the policies and processes attested to in the sworn

declarations of high-level Executive Branch officials, the United States has designs to send

petitioner to a country in circumstances where he will be tortured. Those declarations, after all,

make clear that it is the policy of the United States not to repatriate or transfer a detainee to a

country when the United States believes, based on a number of factors and considerations, it is

more likely than not that the individual will be tortured there. Prosper Decl. ¶ 4; Waxman Decl.

¶ 6. This policy is implemented through a process that contains several levels of precautions and

safeguards. To conclude that an injunction is nevertheless necessary would require the Court to

assume, without any evidence, that the United States' policy and practice is somehow a sham or

pretext. There is no valid basis for such an assumption. Rather, as Judge Walton has found,

respondents' sworn declarations "directly refute the petitioners' allegations of their potential

torture, mistreatment and indefinite detention to which the United States will in some way be

complicit." Almurbati, 366 F. Supp. 2d at 78. Similarly, Judge Bates found that the assortment

of magazine and newspaper stories that petitioners in previous cases had compiled failed to form

a factual predicate justifying an injunction. Thus, petitioner has failed to show that either the

prospect of relinquishment from United States custody or unfounded speculation about possible

torture in a foreign country constitute irreparable harm that must be remedied by a preliminary

injunction.

III.  **PETITIONER CANNOT SHOW A LIKELIHOOD OF SUCCESS
      IN OBTAINING A COURT ORDER PREVENTING A TRANSFER
      IN ACCORDANCE WITH THE POLICIES EXPRESSED IN
      RESPONDENTS' DECLARATIONS**

Petitioner fares no better on the second prong of the preliminary injunction analysis,

which requires him to show that he is likely to succeed, following notice, in preventing a transfer

from Guantanamo.

To be clear, whatever the merits of the issues currently before the D.C. Circuit in the

ongoing appeals in <u>Khalid v. Bush</u>, 355 F. Supp. 2d 311 (D.D.C. 2005), <u>appeals docketed</u>, Nos.

05-5062, 05-5063 (D.C. Cir. Mar. 2, 2005), and <u>In re Guantanamo Detainee Cases</u>, 355 F. Supp.

2d 443 (D.D.C. 2005), <u>appeal on petition for interlocutory appeal</u>, No. 05-5064 et al. (D.C. Cir.),

and of petitioner's claim that he is being wrongfully detained, it is not the likelihood of success

on <u>those</u> issues or claims that matters for purposes of the instant motion for preliminary

injunction.  As two Judges of this Court (who ultimately decided the motion in opposite ways)

agreed, the likelihood of success analysis must focus on the legal basis for petitioner to obtain an

order preventing <u>termination</u> of detention by the United States in the manner described in the

declarations submitted herewith.  See <u>Al-Anazi</u>, 370 F. Supp. 2d at 194 ("[T]he presence of a

sound basis to challenge the legality of one's <u>detention</u> does not at all imply that there exists a

sound basis to challenge the legality of one's <u>transfer</u>.  Put differently, the 'merits,' if you will, to

be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners'

challenge to their <u>transfer</u> from Guantanamo, not to their <u>detention</u> at Guantanamo (emphasis in

original)); <u>Abdah</u>, 2005 WL 711814, at *4 ("<u>if</u> there are no circumstances under which

Petitioners could obtain a court order preventing a contemplated transfer, a preliminary

injunction should not be granted" (emphasis in original)).

The only argument petitioner makes for a likelihood of success on the merits is based on

Rule 23(a) of the Federal Rules of Appellate Procedure, but, as we show below, that rule clearly

does not apply.  Moreover, even if a valid source of legal authority existed for an order

prohibiting a <u>transfer</u>, the Rule of Non-Inquiry, which bars judicial inquiry into the fairness of a foreign nation's justice system and the procedures or treatment that an individual may experience in a foreign nation, weighs heavily against petitioners' likelihood of success in contesting a transfer or repatriation.

### A.    Federal Rule of Appellate Procedure 23 Does Not Apply

Petitioner's primary argument appears to be that Rule 23(a) of the Federal Rules of Appellate Procedure requires notice to the Court and petitioners' counsel before a detainee may be released, repatriated, or transferred.  <u>See</u> Petr's Mem. at 5-6.  However, petitioner never confronts a threshold problem with this argument: the Federal Rules of Appellate Procedure, by their terms, plainly do not apply to this case, in which there has not been any decision undergoing appellate review.  <u>See</u> Fed. R. App. P. 23(a) (applying "[p]ending review of a decision in a habeas corpus proceeding" and only to "the prisoner" in whose proceeding that decision was made); <u>see also</u> Fed. R. App. P. 1(a)(1) ("These rules govern procedure in the United States courts of appeals."); Order dated Dec. 22, 2005, in <u>Tohirjanovich v. Bush</u>, Civ. A. No. 05-994 (JDB), at 1-2 (rejecting Fed. R. App. P. 23(a) argument in case in which, like this one, there had not been any decision undergoing appellate review, because "[t]his case, however, is not 'pending review' in any way"); Order dated May 3, 2005, in <u>Battayav v. Bush</u>, Civ. A. No. 05-714 (RBW) (D.D.C.), at 1 n.1 (rejecting Fed. R. App. P. 23(a) argument in case that, like this one, did not have a pending appeal); <u>Al-Anazi</u>, 370 F. Supp. 2d at 199 n.11 ("The Court notes that petitioners did not even attempt to argue in their papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer decision, because petitioners' habeas petition is not presently on appeal.").

In any event, even in a case in which there is a decision undergoing appellate review,

Federal Rule of Appellate Procedure 23(a) does not have the effect that petitioner ascribes to it.

As Judge Bates has held, "[n]othing in the Rule indicates a desire to extend it to situations where

the United States (or a state) is transferring an individual out of federal or state custody entirely."

O.K. v. Bush, 377 F. Supp. 2d 102, 116 (D.D.C. 2005); see also Order dated Dec. 22, 2005, in

Tohirjanovich v. Bush, Civ. A. No. 05-994 (JDB), at 3-5 (reaffirming holding of O.K.).  Rule

23(a) is designed to ensure that, in situations where a prisoner is transferred from one custodian

subject to federal habeas jurisdiction to another custodian subject to federal habeas jurisdiction,

but remains in the custody of the United States (or relevant state thereof), the court is able to

appropriately substitute the successor custodian as the respondent.  See Fed. R. App. P. 23(a)

("the court, justice, or judge rendering the decision under review may authorize the transfer and

substitute the successor custodian as a party"); Wood v. United States, 873 F. Supp. 56, 57 (W.D.

Mich. 1995) (declining to adopt expansive construction of Rule 23(a) where "the purposes of

Rule 23(a) would not be furthered," which purposes are "reflected in the provisions of the rule

for substituting the successor custodian as a party").  Critically, nothing in Rule 23(a), nor any

other provision of law, operates to restrict the United States from relinquishing custody of an

individual, which, after all, is the ultimate object of a habeas corpus case.  See O.K., 377 F.

Supp. 2d at 116-17; cf. Brady v. United States Parole Comm'n, 600 F.2d 234, 236 (9th Cir. 1979)

(Rule "does not touch upon release" by government).

In light of its focus on "substitut[ing] the successor custodian as a party," Fed. R. App.

Proc. 23(a), the Rule should not be read to cover situations that involve not a transfer from one

United States custodian to another United States custodian, but rather a relinquishment of United

States custody altogether in connection with a transfer or repatriation to a foreign nation. In that situation, there is no "successor custodian" subject to federal habeas jurisdiction who could be substituted as a party.[11] See O.K., 377 F. Supp. 2d at 116 (noting that petitioners' interpretation of the word "another" to include a foreign government "immediately runs into difficulty in the next sentence of the Rule"). Moreover, upon relinquishment of United States custody, the relief available in habeas would have been received and the habeas case therefore would be moot, making substitution of a successor custodian unnecessary.

Historically, Rule 23(a) cases have involved transfers from one United States (or state) custodian to another United States (or state) custodian where the prisoner remained in the custody of the United States (or state authorities). See, e.g., Goodman v. Keohane, 663 F.2d 1044, 1047 (11th Cir. 1981) (involving transfer from federal correctional facility in Miami, Florida to a federal penitentiary in Terre Haute, Indiana); see also Brady, 600 F.2d at 236 (Rule 23 "was promulgated to alleviate jurisdictional problems sometimes created by geographical limits on habeas corpus jurisdiction"). As Judge Bates held, in light of the "well-settled canon of statutory interpretation providing that a court should not construe a statute to interfere with the province of the Executive over military affairs in the absence of a clear manifestation of Congressional intent to do so," the unique situation of detainees captured in the course of ongoing military hostilities does not present an appropriate occasion for indulging a creative interpretation that "would transform a technical and procedural rule that addresses the identity of

---

[11] This is so regardless of whether the foreign nation to which the former Guantanamo detainee is repatriated or transferred may itself detain the individual as a function of its own law enforcement, criminal justice, or other interests, as would be its prerogative. Neither respondents, nor this Court, are in a position to confer upon ex-detainees some kind of worldwide immunity from law enforcement by other sovereign governments.

the parties in a habeas proceeding into a sweeping prohibition on the transfer and release of

military detainees while a case is on appeal." O.K., 377 F. Supp. 2d at 117 (citing Dep't of Navy

v. Egan, 484 U.S. 518, 527 (1988)).  Petitioner does not even acknowledge the O.K. decision, let

alone attempt to distinguish or refute it.

**B.**     **Separation-of-Powers Principles Militate Heavily Against
Petitioner's Likelihood of Success**

Further, even if some valid claim or other legal basis existed for judicial involvement in

transfer or repatriation decisions with respect to enemy combatants held abroad, or for an

advance notice requirement to support and facilitate such involvement, the separation of powers

would bar such relief.  "[I]t is beyond the judicial function for a court to review foreign policy

decisions of the Executive Branch."  People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23

(D.C. Cir. 1999) (citing Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333

U.S. 103 (1948)); see also Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations

such as this, '[t]he controlling considerations are the interacting interests of the United States and

of foreign countries, and in assessing them [the courts] must move with the circumspection

appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our

international relations.'") (quoting Romero v. International Terminal Operating Co., 358 U.S.

354, 383 (1959)).[12]  If the Court were to entertain petitioner's claims to a right to contest

---

[12] In Holmes, U.S. citizen servicemembers sued to prevent the United States government
from surrendering them to West German authorities to serve sentences for convictions by West
German courts on criminal charges relating to their conduct while stationed in West Germany.
Even in this situation involving U.S. citizens, the District Court and D.C. Circuit rejected the
plaintiffs' invitation to examine the fairness of their treatment by the West German courts and
declined to enjoin the transfer, the latter court holding that "the contemplated surrender of
appellants to the Federal Republic of Germany is a matter beyond the purview of this court."  459
(continued...)

repatriation or removal from Guantanamo, it would insert itself into the most sensitive of diplomatic matters. Judicial review of a transfer or repatriation decision could involve scrutiny of United States officials' judgments and assessments on the likelihood of torture in a foreign country, including judgments on the reliability of information and representations or the adequacy of assurances provided, and confidential communications with the foreign government and/or sources therein. Prosper Decl. ¶¶ 9-12. Disclosure and/or judicial review of such matters could chill important sources of information and interfere with our ability to interact effectively with foreign governments. Prosper Decl. ¶¶ 9-12; Waxman Decl. ¶ 8. In particular, the foreign government in question, as well as other governments, would likely be reluctant to communicate frankly with the United States in the future concerning torture and mistreatment concerns. Prosper Decl. ¶¶ 10, 12. This chilling effect would jeopardize the cooperation of other nations in the war on terrorism. Prosper Decl. ¶¶ 10, 12; Waxman Decl. ¶ 8.

Because of these foreign relations implications, as developed most extensively in the analogous context of extradition, courts have uniformly eschewed inquiry into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)); see Al-Anazi, 370 F. Supp. 2d at 194 (holding that this "well-established line of cases in the extradition context" "counsel[s] even further against judicial interference"). This principle is sometimes called the Rule of Non-Inquiry. For example, in Ahmad v. Wigen, 910 F.2d 1063 (2d

<hr>

[12](...continued)
F.2d at 1225.

Cir. 1990), a United States citizen was extradited from the United States to Israel to stand trial for an alleged terrorist attack. While the district court upheld the extradition only after receiving testimony and extensive documentation concerning Israel's law enforcement system and treatment of prisoners, the Second Circuit held that such inquiry was wholly improper. "The interests of international comity are ill-served," the Second Circuit explained, "by requiring a foreign nation such as Israel to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." Id. at 1067. "It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." Id. Accord Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) (refusing to bar extradition based on allegations that appellant "may be tortured or killed if surrendered to Mexico," because "the degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch" (internal quotation marks omitted)); Peroff v. Hylton, 563 F.2d 1099, 1102 (4th Cir. 1977); Matter of Extradition of Sandhu, 886 F. Supp. 318, 321-23 (S.D.N.Y. 1993); Hoxha v. Levi, 371 F. Supp. 2d 651, 659-61 (E.D. Pa. 2005) (holding that allegations that individual would be tortured after extradition to Albania were solely for the Secretary of State to weigh, and not an appropriate subject for judicial inquiry), on appeal, No. 05-3149 (3d Cir.). See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991).

The force of these principles is not diminished by the fact that petitioner seeks judicial review of any kind of transfer, repatriation or removal from Guantanamo before petitioner may be transferred or released, rather than merely trying to block an extradition. The considerations

that underlie the Rule of Non-Inquiry are not endemic to the specific context of extradition, but instead rest on the constitutional separation of powers.[13]  See Matter of Requested Extradition of Smyth, 61 F.3d 711, 714 (9th Cir. 1995) ("Undergirding this principle is the notion that courts are ill-equipped as institutions and ill-advised as a matter of separation of powers and foreign relations policy to make inquiries into and pronouncements about the workings of foreign countries' justice systems."); Sandhu, 886 F. Supp. at 321 ("The rule of non-inquiry arises from recognition that the executive branch has exclusive jurisdiction over the country's foreign affairs."); cf. Holmes, 459 F.2d at 1219-23 (holding, in a non-extradition context, that considerations similar to those embodied in the Rule of Non-Inquiry made it improper for the Judiciary to examine allegations of unfairness in a foreign nation's trial of a U.S. citizen).  Thus, petitioners cannot turn to the courts to second-guess Executive judgments about matters such as

---

[13] Some petitioners in Guantanamo detainee habeas cases have argued that the Rule of Non-Inquiry is contingent on the existence of an extradition treaty, citing In re Extradition of Howard, 996 F.2d 1320, 1329 (1st Cir. 1993).  However, the applicable language from Howard was characterized as dicta by the First Circuit in a subsequent decision.  Kin-Hong, 110 F.3d at 111 n.12.  In that later case, while pretermitting the question "[w]hether the doctrine is constitutionally mandated" as "immaterial here," the First Circuit cited an analogy to the act-of-state doctrine and described the doctrine using language imbued with constitutional significance.  See id. at 110-11 ("The rule of non-inquiry, like extradition procedures generally, is shaped by concerns about institutional competence and by notions of separation of powers.  It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.") (citation omitted).

Moreover, to the extent that petitioner may contend that the only possible way to transfer him would be pursuant to an extradition treaty or statute, such a contention would be wholly without merit.  See United States v. Alvarez-Machain, 504 U.S. 655 (1992); Ker v. Illinois, 119 U.S. 436 (1886); Coumou v. United States, 107 F.3d 290, 295 (5th Cir. 1997) (reversing lower court's holding, 1995 WL 2292, *11 (E.D. La. Jan. 3, 1995), that "[n]or did the United States, or its officers or agents, have the discretion to deliver an arrested person to the government of Haiti, unless the extradition laws of the United States were followed").

custodial conditions and/or the adequacy of legal procedures in a foreign country as well as the

credibility and adequacy of a foreign government's assurances.  Cf. People's Mojahedin, 182 F.3d

at 23 (expressing reluctance of courts to interfere in matters "'for which the Judiciary has neither

aptitude, facilities nor responsibility and have long been held to belong in the domain of political

power not subject to judicial intrusion or inquiry'" (quoting Chicago & Southern, 333 U.S. at

111)).

***

Thus, there is no basis in law for an injunction requiring advance notice of an upcoming

transfer or repatriation in order to enable petitioner to seek a judicial order blocking it.  Neither

the Court's habeas corpus jurisdiction nor any other legal authority supports the notion of

ordering custody that the United States wishes to relinquish to nevertheless be artificially and

indeterminately prolonged purely to preserve a live case for the Court.  And, apart from the

absence of affirmative legal authority, separation of powers considerations and foreign relations

sensitivities preclude a judicial inquiry in which this Court would substitute its judgment

regarding the appropriateness of transfer or repatriation for that of the appropriate Executive

Branch officials.

## IV.     AN INJUNCTION REQUIRING ADVANCE NOTICE BEFORE
A TRANSFER OR REPATRIATION WOULD TRAMPLE ON THE
SEPARATION OF POWERS

It is undisputed that the sole reason petitioner seek advance notice is to enable his counsel

to seek an order blocking a transfer or repatriation decision that the Executive would already

have made after consultation and coordination with the foreign government in question.

Petitioner freely admits that his motion is all about ensuring "judicial involvement in such a

22

transfer." Petrs' Mem. at 5. Such "judicial involvement" portends the harms discussed in the declarations of then Deputy Assistant Secretary Waxman and then Ambassador Prosper submitted herewith. See Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Even if such judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm. See supra Section III.C (describing interests of international comity that underlie the Rule of Non-Inquiry); Waxman Decl. ¶ 8; Prosper Decl. ¶¶ 10, 12. Moreover, the very prospect of judicial review, as exemplified by an advance notice requirement, causes separation-of-powers harm by undermining the ability of the Executive Branch to speak with one voice in its dealings with foreign nations. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments"). Either type of requirement, after all, would make the results of diplomatic dialogue between the Executive Branch and a foreign government regarding repatriations or transfers inherently contingent because the effective acquiescence of another Branch (i.e., the Judiciary) would be required for a transfer or repatriation to go forward, and such a requirement would also inject delays into future transfers. These harms weigh heavily against entry of a preliminary injunction.

## V.    AN INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

The public interest favors allowing the Executive Branch, which is constitutionally vested with the authority both to conduct military functions, such as detention of enemy combatants for the duration of hostilities, and to engage in foreign relations, to act without undue intrusion

within its constitutional sphere of responsibility.   As another Judge of this Court has held:

> [T]here is a strong public interest against the judiciary needlessly intruding upon
> the foreign policy and war powers of the Executive on a deficient factual record.
> Where the conduct of the Executive conforms to law, there is simply no benefit –
> and quite a bit of detriment – to the public interest from the Court nonetheless
> assuming for itself the role of a guardian ad litem for the disposition of these
> detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is beyond the
> judicial function for a court to review foreign policy decisions of the Executive
> Branch.").

Al-Anazi, 370 F. Supp. 2d at 199.  Here, as well, the public interest disfavors an injunction.[14]

### CONCLUSION

For the reasons stated above, respondents respectfully request that petitioner's motion for

a preliminary injunction be denied.

Dated: January 30, 2006                    Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           KENNETH L. WAINSTEIN
                                           United States Attorney

---

[14]  Petitioner's public interest argument, by contrast, is a non sequitur.  Petitioner block
quotes what the parties agree is the United States' policy not to transfer individuals to countries
where it is more likely than not that they will be tortured.  Petrs' Mem. at 8; compare Prosper
Decl. ¶ 4; Waxman Decl. ¶ 6.  If anything, the existence of this policy and respondents'
acknowledgment of it and commitment to follow it militate against an injunction.  What
petitioners' argument boils down to is the proposition that the public interest favors instituting a
regime of automatic judicial supervision of the Government's adherence to its own policies.
There is no legal basis for that proposition even in general, see Lyng v. Northwest Indian
Cemetery Protective Ass'n, 485 U.S. 439, 455 (1988) (general statement of "the policy of the
United States" does not itself "create a cause of action or any judicially enforceable rights" that
would "authorize[] an injunction"), let alone in areas falling squarely within the Executive's
purview such as foreign relations and the disposition of alien enemy combatants held by the
Military.  The public interest surely does not support assuming without any foundation that
Executive Branch officials are wont to violate their policies unless actively supervised by the
courts.

24

DOUGLAS N. LETTER
Terrorism Litigation Counsel


  /s/ Robert J. Katerberg
JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
EDWARD H. WHITE
PREEYA M. NORONHA
ROBERT J. KATERBERG
ANDREW I. WARDEN
NICHOLAS J. PATTERSON
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents