UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

Filed with Classified Information Security Officer
CISO [signature]
Date 10/28/2024

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

OMAR MOHAMMED ALI AL-RAMMAH,

    Petitioner,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*

    Respondents.

Civil Action No. 05-2380 (CKK)

Unsealed ~~UNDER SEAL~~

Judge Kollar-Kotelly
12/6/2024

---

**CLASSIFIED MEMORANDUM OPINION**
(October 28, 2024)

Petitioner Omar Mohammed Ali al-Rammah ("al-Rammah")[1] is a Yemeni national who has been detained by the United States Government at Naval Station Guantanamo Bay in Cuba since May 2003. In December 2005, he filed a petition for a writ of habeas corpus seeking release from detention. He amended his petition in July 2006. After several delays, including some that were beyond the control of the parties or the Court, al-Rammah's petition is fully briefed and the Court has scheduled an evidentiary hearing to decide its merits. Now pending before the Court is the Petitioner's Motion for Judgment on the Record, which the Respondents oppose. *See* Pet'r's Mot. for Judgment on the Record and Prehearing Mem. ("Pet'r's Mot." or "Motion"); Resp'ts' Response to Pet'r's Mot. for Judgment on the Record and Prehearing Mem. ("Resp'ts' Mem."). Upon consideration of the parties' submissions,[2] the relevant legal authority, and the entire record,

---

[1] The Court identifies the Petitioner using the name that appears in the caption of his pending Motion for Judgment on the Record. The Petitioner is also identified elsewhere in the parties' submissions by the names Zakaria al-Baidany and Faysal Alawi Ali al-Rammah. *See, e.g.*, Pet'r's Traverse to Resps.' Second Am. Narrative (Aug. 8, 2022) at 1 n.1; Resps.' Pretrial Merits Brief (Feb. 2, 2024) at 1 & n.2, 32.

[2] The Court's consideration has focused on the Respondents' Second Amended Narrative (filed May 24, 2019), the Petitioner's Traverse to Respondents' Second Amended Narrative (filed Aug. 8, 2022), the Respondents' Pretrial Merits Brief (filed Feb. 2, 2024), the Petitioner's Motion for Judgment on the Record and Prehearing Memorandum

1

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

the Court shall **DENY** the Motion for Judgment on the Record and proceed with the Merits Hearing that is scheduled to begin on November 18, 2024.

## I. BACKGROUND

Petitioner al-Rammah was captured in ▮▮▮▮▮▮▮▮▮ Georgia, in April 2002. After spending a year ▮▮▮▮▮▮—during which he was interrogated by officers of United States agencies that are not identified in the public record—he was taken to Guantanamo Bay, Cuba in May 2003. He has been held there, without charge, ever since. Respondents assert that al-Rammah is lawfully detained at Guantanamo Bay under the authority of the 2001 Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), "as informed by the principles of the laws of war." *See* Resp'ts' Second Am. Narr. ("Narr.") ¶ 1; *see also* National Defense Authorization Act ("NDAA") for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) (reaffirming "that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority for the Armed Forces of the United States to detain covered persons . . . pending disposition under the law of war" and defining "covered persons" to include any "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners").

### A. Events Preceding Detention

The parties dispute nearly all of the facts underlying al-Rammah's initial detention, but they agree on two basic facts. First, they agree that al-Rammah was ▮▮▮▮▮▮▮ alongside Chechen fighters from early- or mid-2001 until he was captured in April 2002 ▮▮▮▮▮.

---

(filed Feb. 2, 2024), the Petitioner's Statement of Undisputed Material Facts (filed Feb. 2, 2024), the Petitioner's Statement of Disputed Material Facts (filed Feb. 21, 2024), the Respondents' Response to Petitioner's Motion for Judgment on the Record and Prehearing Memorandum (filed Feb. 21, 2024), and the Petitioner's Response under Section III(C) of the Case Management Order (filed Feb. 21, 2024).

2

~~SECRET//NOFORN~~

█████████████ by forces of a foreign government. Resp'ts' Mem. at 49; Pet'r's Mot. at 1, 4, 6 & att. B ¶¶ 7, 10. Second, they agree that he used the name "Zakariya" while he was in the Pankisi Gorge region. Resp'ts' Mem. at 49; Pet'r's Resp. at 15, 18.

Beyond these basic facts, the parties present fundamentally different accounts of al-Rammah's actions █████████ preceding his capture and his role—if any—in the ongoing military conflict between the United States and al Qaeda that the Respondents assert is the basis for his continued detention.

Al-Rammah contends that he was in the Pankisi Gorge "to support the latest round of the centuries-long struggle by the Chechens for independence from Russia." Pet'r's Traverse to Resp'ts' Second Am. Narrative ("Traverse") ¶ 1. He insists that there was "no connection between al-Qaeda and the Chechen fight for independence," that he "had nothing to do with al-Qaeda," and that he "was unaware of any al-Qaeda presence in the Pankisi Gorge." Pet'r's Mot. at 5–6. Instead, he says he "ran errands and carried out tasks to support those fighting in Chechnya," Traverse ¶ 1, and that "[a]ll his actions were done in furtherance of" the goal of "supporting the Chechens in their fight against the Russians." Pet'r's Statement of Disputed Material Facts ¶ 11.

The Respondents, by contrast, contend that al-Rammah is the al Qaeda fighter and facilitator known by the pseudonyms "Zakariya" █████████████████████████
████████████████████████████████████████
████████████████████████ Resp'ts' Mem. at 37–38, 42–44; Narr. ¶¶ 54–56, 72–80. The Respondents also allege that al-Rammah, acting under the pseudonym ████ sought to ████████████████████████████████ after

---

[3] Various other spellings of these names appear in the record, including "Zakaraia," "Zakaria," ████

3

~~SECRET//NOFORN~~

September 11, 2001. Resp'ts' Mem. at 44–45; Narr. ¶¶ 68–71. Finally, the Respondents allege that al-Rammah has various other ties to al Qaeda, including that he was acquainted with ▇▇▇ ▇▇▇ who ran a training camp in Afghanistan, Narr. ¶ 58, that he may have trained at that al Qaeda associate's camp, *id.*, ▇▇▇ ▇▇▇, *id.* ¶¶ 91–94, and that he had contact with various other al Qaeda associates including Usama bin Laden's youngest son, Hazma bin Laden, *id.* ¶¶ 108, 110. The Respondents "do not contend that [al-Rammah] is detainable because he supported the Chechen separatists," but instead because these other activities and associations "demonstrate that he was part of and substantially supported [al Qaeda] and associated forces." Resp'ts' Mem. at 31.

Al-Rammah, for his part, denies that he is the person referred to as "Zakariya" or ▇▇▇ in the ▇▇▇ reports the Respondents have produced in support of his detention, and he denies that he ever used the name ▇▇▇ during his time in Georgia. Pet'r's Statement of Disputed Material Facts ¶¶ 7–8, 10. He also denies that he had any role in ▇▇▇ ▇▇▇. *Id.* ¶¶ 7, 9; Pet'r's Mot. at 42-43. He further denies that ▇▇▇. Pet'r's Statement of Disputed Material Facts ¶¶ 7, 9; Pet'r's Mot. at 41. He contends that any training he received in Afghanistan was solely to prepare him to fight alongside the Chechens and is not evidence of an al Qaeda affiliation. Pet'r's Mot. at 40–41. He also denies that ▇▇▇ ▇▇▇, Pet'r's Mot. at 43, and contends that ▇▇▇ ▇▇▇ *id.* at 40. Finally, he denies that he ever personally knew Hazma bin Laden. Pet'r's Statement of Disputed Material Facts, ¶¶ 5–6.

~~SECRET//NOFORN~~

### B. Recent Developments

Nearly two decades after al-Rammah arrived at Guantanamo Bay, the Periodic Review Board ("PRB") concluded that al-Rammah's continued detention was "no longer necessary to protect against a significant threat to the security of the United States."[4] Pet'r's Ex. 2. In support of that conclusion, the PRB found that "there is no information indicating that [Al-Rammah] engaged in activities against the United States prior to detention." *Id.* When describing the conditions that would be necessary for al-Rammah to be transferred out of the custody of the United States, the PRB recommended just one condition: that "[a]ppropriate security assurances are negotiated by and agreed to by relevant [United States Government] departments and agencies." *Id.*

Nearly two years later, the Respondents notified the Court that "they intend[ed] to transfer" al-Rammah ████████████ from Naval Station Guantanamo Bay ████████████
████████████████████████████████████████████
████ Respondents informed the Court that the Secretary of Defense had already notified Congress of the intended transfers and certified to Congress that certain statutorily required conditions for the transfers had been satisfied. *Id.* (citing NDAA of 2016, Pub L. No. 114-92 § 1034, 129 Stat. 726, 969-970 (2015); Intelligence Authorization Act of 2012, Pub. L. No. 112-87 § 308, 125 Stat. 1879, 1883 (2012)).

████████████████████████████████████████████
████████████████████████████████████████████

---

[4] President Barack Obama established the PRB by executive order "to review on a periodic basis the executive branch's continued, discretionary exercise of detention authority in individual cases." Executive Order 13,567 § 1(b), 76 Fed. Reg. 13,277 (Mar. 7, 2011). The PRB is tasked with determining, in each case, whether "[c]ontinued law of war detention" is "necessary to protect against a significant threat to the security of the United States." *Id.* § 2; *see also* NDAA for Fiscal Year 2012, Pub. L. No. 112-81, § 1023, 125 Stat. 1298, 1562–63 (2011).

5



One year later, al-Rammah's situation is unchanged. Although Respondents assert that they still intend to transfer him ▮▮▮ he remains detained at Guantanamo Bay. Joint Status Report (Oct. 11, 2024), ECF No. 365. In their most recent filing, Respondents describe the circumstances impeding the transfer as follows:

> Respondents continue to note that current circumstances, ▮▮▮ ▮▮▮ continue to raise certain question that have delayed Petitioner's transfer. Respondents further note that the Government continues to work in the context of those circumstances and events ▮▮▮ towards resolving those questions so as to move forward with the transfer when circumstances permit. Respondents also ▮▮▮

Joint Status Report (Oct. 11, 2024), ECF No. 365.

## II. ANALYSIS

Al-Rammah raises three arguments for judgment on the record, but none succeed. First, he argues that his continued detention is unlawful, regardless of the factual basis for his initial detention, because the Periodic Review Board ("PRB") has determined that his "continued law of war detention is no longer necessary to protect against a continuing significant threat to the United States" and ▮▮▮ Respondents had made all the arrangements they deemed necessary

6

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

to transfer him ▓▓▓▓ Pet'r's Mot. at 2–3, 15–24. Second, he argues he has a right to substantive due process and that his continued detention "years after [the] Respondents concluded that his detention is unnecessary" and "months after they had made all the arrangements they considered necessary for his release" violates that right. Pet'r's Mot. at 3, 24–33. Third, he argues that the Respondents' evidence is legally insufficient to justify his continued detention because it consists largely of "unsourced hearsay" that is unreliable and not credibly tied to him. Pet'r's Mot. at 3, 33–43. Because each of these arguments fails, the Court shall deny al-Rammah's Motion for Judgment on the Record and proceed with the Merits Hearing that is scheduled to begin on November 18, 2024.

### A. The PRB determination and the preparations for transfer ▓▓▓▓ do not, without more, show that al-Rammah's continued detention is unlawful.

Al-Rammah's strongest argument for judgment on the record is based on the proposition that, under the law-of-war principles that "inform" the Executive's detention authority under the AUMF, the Executive may not continue detention that is "arbitrary" or "no longer . . . necessary." Pet'r's Mot. at 16. He contends that the PRB determination in December 2021 and aborted transfer ▓▓▓▓▓▓▓▓▓▓▓▓ both show that his continued detention is arbitrary and unnecessary, and he argues that his continued detention is therefore unlawful. *Id.* at 16.

This argument finds some support in the United States Court of Appeals for the District of Columbia Circuit's decision in *al-Hela v. Biden*, 66 F.4th 217 (D.C. Cir. 2023) (en banc). In that case, the court stated that the PRB's factual findings "could . . . be relevant to a court's consideration of whether [a petitioner's] continued detention violates the law of war and thus potentially contravenes the statutory authority conferred by the AUMF." *Id.* at 244. Specifically, because "the 'purpose of [law of war] detention is to prevent captured individuals from returning to the field of battle and taking up arms once again,'" the PRB's finding that a petitioner's transfer

7

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

would not present a risk to national security could be relevant to the legality of continued detention. *Id.* (alteration in original) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 518 (2004)). However, the court acknowledged that it is "an open question" in this Circuit whether "the laws of war place *any* limits on the President's detention authority under the AUMF," and it declined to decide "whether the [PRB]'s [d]etermination [that a petitioner's continued detention is no longer necessary] renders [the p]etitioner's continued detention unlawful under the AUMF." *Id.* (emphasis in original).

Al-Rammah's argument ultimately fails because, under binding precedent in this Circuit, the detention under the AUMF individuals who were "part of" or "substantially supported" al Qaeda is lawful for the duration of hostilities between the United States and al Qaeda, regardless of whether the Government has shown that those individuals pose a specific threat to the interests of the United States if released. *See, e.g., Al-Alwi v. Trump*, 901 F.3d 294, 299 (D.C. Cir. 2018) ("The AUMF authorizes detention for the duration of the conflict between the United States and the Taliban and al Qaeda."). And this Court must defer to the Executive's determination that this conflict is still ongoing, more than two decades after it began. *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010) ("The determination of when hostilities have ceased is a political decision, and [courts] defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional determination purporting to terminate the war."). Accordingly, notwithstanding the statement in *al-Hela* that the PRB's factual findings may be "relevant" to the scope of the Executive's detention authority under the AUMF, 66 F.4th at 244, binding precedent requires this Court to conclude that the detention of a person who was "part of" or "substantially supported" al Qaeda remains lawful "for the duration of the conflict between the United States and the Taliban and al Qaeda." *See Al-Alwi*, 901 F.3d at 299.

8

~~SECRET//NOFORN~~

Even assuming, without deciding, that law-of-war principles impose an outer limit on the Executive's detention authority under the AUMF while hostilities between the United States and al Qaeda are ongoing, the PRB's determination that al-Rammah's continued detention is no longer necessary does not negate the lawfulness of that detention. First, and most fundamentally, the Executive Order establishing the PRB and conferring on it the power to make determinations regarding the necessity of continued detention "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party." Executive Order 13,567 § 10(c), 76 Fed. Reg. 13,277 (Mar. 7, 2011). Second, the PRB is tasked only with determining whether continued detention is "*necessary* to protect against a continuing *significant* threat to the United States," which is a different issue than whether continued detention serves the lawful purpose of preventing a detainee from returning to the battlefield in a still-ongoing conflict. *See id.* §§ 2, 3; *see also Hamdi*, 542 U.S. at 518 ("The purpose of [law of war] detention is to prevent captured individuals from returning to the field of battle and taking up arms once again."). Therefore, while the PRB's determination and the subsequent preparations for al-Rammah's transfer may be relevant to this Court's assessment of the legality of al-Rammah's continued detention under the AUMF, they are not dispositive, and they do not entitle him to judgment on the record.

**B.     Al-Rammah has not shown that his continued detention violates substantive due process.**

Al-Rammah next argues that his continued detention violates substantive due process, but for similar reasons, this argument also fails. Whether detainees like al-Rammah are entitled to any of the protections of the Due Process Clause remains an open question in this Circuit. *See al-Hela*, 66 F.4th at 225–26. Therefore, the Court begins by assuming, without deciding, that al-Rammah is entitled to the substantive protections of that Clause. *See id.* at 242 (adopting same analytical

9

~~SECRET//NOFORN~~

approach). Proceeding under that assumption, the Court concludes that the Petitioner's continued detention does not violate substantive due process.

Government conduct violates substantive due process when it "'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citation omitted) (first quoting *Rochin v. California*, 342 U.S. 165, 172 (1952); and then quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)). The "threshold question" in a substantive due process challenge to action by the Executive is whether the action at issue "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

On the present record, al-Rammah has not shown that his continued detention "shock[s] the contemporary conscience." *See id.* Although al-Rammah has been detained for more than two decades, binding precedent holds that the "lengthy duration" of the conflict between the United States and al Qaeda, without more, does not make detention for the duration of that conflict a violation of substantive due process. *Al-Hela*, 66 F.4th at 245. And because al-Rammah's continued detention is at least arguably consistent with the AUMF and the lawful purpose of preventing him from rejoining a still-ongoing conflict, neither the PRB's discretionary determination that his continued detention is no longer necessary nor the aborted transfer attempt ████████████ render his detention arbitrary or conscience-shocking.

Because the undisputed facts do not establish that al-Rammah's continued detention violates any rights he may have arising from the substantive component of the Due Process Clause, the Court shall not grant judgment on the record on the basis of those asserted rights.

10

~~SECRET//NOFORN~~

**C.   The Respondents' evidence may be sufficient to show, by a preponderance of the evidence, that al-Rammah was "part of" or "substantially supported" al Qaeda or associated forces.**

Finally, al-Rammah argues that the Respondents' evidence is unreliable and legally insufficient to support his continued detention. Because the reliability of the evidence is best assessed in the context of a Merits Hearing, the Court shall not grant judgment on the record based on these arguments.

At a Merits Hearing, "the [G]overnment bears the burden of proving by a preponderance of the evidence that the petitioner is an enemy combatant and lawfully detained." *Al-Hela*, 66 F.4th at 233 (citing Case Management Order §§ II.A, III.B). The D.C. Circuit has held, *en banc*, that the preponderance standard is consistent with the requirements of the Due Process Clause in part because "it is appropriate" for a detainee who is "a foreign national detained as an enemy combatant and suspected of substantially supporting designated terrorist organizations" to "share the risk of error nearly equally with U.S. society." *Id.* at 236.

Here, the Respondents seek to meet their burden in large part through reliance on so-called "raw" intelligence reports, which are timely accounts of intelligence officers' observations in the field that are circulated within the Intelligence Community but have not been distilled into "finished" intelligence products by analysts with access to related intelligence ███████. Resp'ts' Mem. at 23. For example, the Respondents rely in part on intelligence reports ████████████████████████████████████████████ which describe the circumstances of his capture and summarize intelligence officers' impressions of his responses to early questioning. *See, e.g.*, Resp'ts' Exs. 69, 77, 79. They also rely in part on contemporaneous intelligence reports that describe alleged activities of the facilitator known as "Zakariya" and ███████ whom they contend is al-Rammah, which they argue show that the Petitioner participated in and provided substantial support to al Qaeda ███████

11

~~SECRET//NOFORN~~

████████. *See, e.g.*, Resp'ts' Exs. 64, 66–67, 87–88. And they rely on intelligence reports ████████████████████████████████████████████████████ *See, e.g.*, Resp'ts' Exs. 33, 69, 154, 175, 210.

Al-Rammah argues that many of these reports are unreliable hearsay that do not satisfy the minimum standards for admissibility in this proceeding. Pet'r's Mot. at 33–39. He urges the Court not to consider them when determining whether his continued detention is lawful, and then to conclude that the remaining evidence is insufficient to support his detention. *Id.* at 33–44. For three reasons, the Court shall not exclude any of the reports now, but instead shall consider al-Rammah's arguments about their reliability when determining what weight to afford the evidence in the context of the Merits Hearing.

First, the D.C. Circuit has approved of reliance on "raw" intelligence reports in proceedings like this one, instructing that "the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty," rather than relying solely on reports in which the identity and reliability of sources might be more obscured. *Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008) (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993)); *see also Barhoumi v. Obama*, 609 F.3d 416, 428 (D.C. Cir. 2010) (noting that "*Parhat* sets the guideposts for [courts'] inquiry into the reliability of . . . hearsay" in habeas proceedings like this one).

Second, hearsay statements are "always admissible" in Guantanamo Bay habeas proceedings, *Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010), subject to "rigorous

12

~~SECRET//NOFORN~~

evidentiary analysis" to test the reliability of the statements, *al-Hela*, 66 F.4th at 238. "Therefore, the question a habeas court must ask when presented with hearsay is not whether it is admissible . . . but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani*, 509 F.3d at 879. In *al-Hela v. Biden*, the *en banc* D.C. Circuit recently elaborated on the kind of analysis it expects courts to perform when assessing reliability and ascribing weight to evidence in this context. *See* 66 F.4th at 238. In that case, the court affirmed Judge Royce C. Lamberth's reliance on multiple hearsay statements, noting that Judge Lamberth had "carefully evaluated all the evidence proffered by the [G]overnment," "assessed the reliability of all hearsay," "excluded or refused to rely upon some of the hearsay statements proffered by the [G]overnment . . . [that] were unreliable or insufficiently corroborated," "made multiple reliability findings throughout its opinion," "explained its reasoning" for finding some hearsay statements more reliable than others, and "meticulously reviewed all the evidence proffered by the [G]overnment to compare and contrast the various hearsay statements and determine which statements were corroborated and reliable." *Id*. This "careful and discerning review of the documents containing hearsay" satisfied the requirements of due process. *Id*. This Court shall apply a similarly rigorous analysis to the parties' proffered hearsay evidence in the context of the merits hearing, and it therefore declines to conclude at this stage that any individual piece of the Respondents' evidence is entirely unreliable.

Finally, in these proceedings, "a rebuttable presumption of regularity applies to official government records, including intelligence reports." *Latif v. Obama*, 677 F.3d 1175, 1185 (D.C. Cir. 2011) (decided Oct. 14, 2011; reissued Apr. 27, 2012). "[T]he presumption of regularity, if not rebutted, only permits a court to conclude that the statements in a government record were actually made; it says nothing about whether those statements are true." *Id*. It amounts to a

~~SECRET//NOFORN~~

presumption that "the government official accurately identified the source and accurately summarized his statement, but it implies nothing about the truth of the underlying non-government source's statement." *Id.* at 1180. A petitioner may rebut this presumption by "demonstrat[ing] internal inconsistencies or inconsistencies with other evidence." *Al-Hela*, 66 F.4th at 237 (citing *id.* at 1185–86).

Applying these principles, the Court declines to exclude from its consideration the "raw" intelligence reports or any other individual piece of evidence on which the Respondents rely. Instead, mindful of the Court's duty to "consider all the evidence in context," the Court shall determine in the context of the parties' presentations at the Merits Hearing what weight, if any, should be afforded to each of the challenged reports and exhibits in light of the entire record and the relevant legal authority. *See Latif*, 677 F.3d at 1193; *see also* Al Rabiah v. United States, 658 F. Supp. 2d 11, 17 (D.D.C. 2009) (CKK) (explaining that the Court would "make [reliability] determinations in the context of the evidence and arguments presented during the Merits Hearing"); *Al Odah v. United States*, 648 F. Supp. 2d 1, 5 (D.D.C. 2009) (CKK) (same), *aff'd* 611 F.3d 8 (D.C. Cir. 2010). And because the Respondents' evidence, if credited, may be sufficient to show by a preponderance of the evidence that al-Rammah was "part of" or "substantially supported" al Qaeda or associated forces, the Court shall not grant judgment on the record on the basis that the Respondents' evidence is insufficient to support al-Rammah's continued detention.

## IV. CONCLUSION

For the foregoing reasons, the Court shall **DENY** Petitioner al-Rammah's Motion for Judgment on the Pleadings. An appropriate Order accompanies this Classified Memorandum Opinion.

Dated: October 28, 2024

*/s/ Colleen Kollar-Kotelly*
COLLEEN KOLLAR-KOTELLY
United States District Judge

14